IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DANIEL RAY CONLEY,                  )
     Plaintiff,                     )          Civil Action No. 7:22-cv-00027
                                    )
v.                                  )
                                    )          By: Elizabeth K. Dillon
SGT. KERRY GRIGSBY, *et al.*,        )              United States District Judge
     Defendants.                    )

**MEMORANDUM OPINION**

*Pro se* plaintiff Daniel Ray Conley, an inmate in the custody of the Virginia Department of Corrections (VDOC), brought this civil rights action asserting claims pursuant to 42 U.S.C. § 1983. His primary claims are a claim of excessive force upon arrest, against defendants Deputy Tharp, Sergeant Grigsby, and Deputy Berry (Claim 1) and a negligence claim, or perhaps a deliberate indifference claim, based on a "failure to treat [his] medical condition" against the remaining five defendants (Claim 2), all of whom are personnel at the Culpeper County Jail ("the Jail"), where he was taken upon his arrest and housed for months afterward. (Am. Compl. ¶ E.) Those five defendants are: (1) Jonny Jenkins, described as the Chief Jailer; (2) Deputy Glasscock; (3) Nurse Traci Cooke; (4) Deputy Fordyce; and (5) Deputy Manueal.

Conley's complaint also contains additional allegations, although he does not link most of them to specific defendants. It is unclear whether he is asserting separate claims based on those allegations, or they are merely background for his medical claims. (*See generally* Am. Compl., Dkt. No. 14.) They include an incident in which he alleges that a deputy sprayed Lysol "in his face" while he was housed in a medical cell, (*id.* at 9–10), as well as claims that the Jail would not allow family to drop off shoes for him, that he was required to sleep on a mat on the floor of his cell, and that there were delays in receiving ice and medicine.

Defendants have filed what they title a motion to dismiss (Dkt. No. 38), but both they and

Conley also have included in their briefing and submitted to the court information outside the pleadings, such as affidavits, some of Conley's medical records, other documents, and video evidence. Thus, the court will consider that material and treat the motion as one for summary judgment, pursuant to Federal Rule of Civil Procedure 56.[1]

In their motion, defendants argue that Conley failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA), and so he is barred from bringing any of the claims that relate to his stay at the Jail, which would include Claim 2 concerning his medical treatment and the additional allegations he has included about incidents that occurred at the Jail. As to Claim 1, which alleges excessive force upon his arrest, defendants contend that the videos of the dashcam and bodycam from his arrest, in conjunction with facts Conley admits in his amended complaint, show that his arrest was supported by probable cause and that the force used was not objectively unreasonable. Thus, they did not violate Conley's Fourth Amendment rights. (*See generally* Mem. Supp. Mot. Dismiss, Dkt. No. 39.)

Conley filed a two-part response to the motion to dismiss, defendants filed a reply, and Conley filed what is effectively an unauthorized sur-reply, all of which the court has considered. (Dkt. Nos. 50, 51, 65, 72.) The court also has reviewed a number of additional letters or documents from Conley, mostly docketed as "Additional Evidence." (Dkt. Nos. 52, 59, 60.) The matter is ripe for disposition.

For the reasons set forth below, the court concludes that defendants are entitled to summary judgment on both grounds asserted in their motion. Thus, it will grant the motion for summary judgment as to all federal claims. It will decline to exercise jurisdiction over any state-law claims.

---

[1] A notice based on *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), was sent to plaintiff and warned of that possibility. (Dkt. No. 40.) Thus, the notice required by Federal Rule of Civil Procedure 12(d) has been given.

## I. FACTUAL BACKGROUND[2]

**A. Conley's Arrest**

On January 28, 2021, Conley was involved in a lengthy and dangerous high-speed chase in an attempt to elude law enforcement.  The chase ended when one of the pursuing officers successfully used a "pitting" maneuver, causing Conley's car to spin to a stop.[3]

The computer-aided dispatch (CAD) report reflecting information transmitted to the officers during and immediately following the chase indicates that, as of 5:00 p.m., two units were in pursuit of a vehicle being driven by a wanted subject.  The initial officers had gotten a tip that there was a wanted subject in the vehicle, and when they tried to stop him, he fled.  (CAD Report, Pl.'s Add'l Evidence, Dkt. No. 60.)

During the course of the pursuit, dispatch relayed Conley's name, noted that he was wanted out of Stafford County and Louisa County for felony violation of a court order, possession of narcotics, a failure to appear on larceny charges, and a failure to comply with CBT[4] and trespass order.  It also conveyed that, at some point, he was observed "digging for something" in his vehicle.  The CAD report further reported to officers that at several points he was driving in excess of 85 miles per hour, at least twice reached 90, and crossed over the double yellow line.  The chase went on for more than twenty minutes and crossed through several

---

[2]  The court includes in this background statements from Conley's verified amended complaint, which the court can treat as facts in opposition to summary judgment, if based on personal knowledge.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that verified complaints by *pro se* prisoners can be considered as affidavits in opposition to summary judgment when the allegations contained therein are based on personal knowledge).

[3]  A PIT maneuver is an acronym for "precision immobilization technique" and refers to a specific driving technique in which a pursuing law enforcement vehicle makes contact with a fleeing vehicle in an effort to cause it to spin to a stop.  *Scott v. Harris*, 550 U.S. 372, 375 (2007).  It is also sometimes referred to as a "pursuit immobilization technique" or  "precision intervention technique."  *Dalton v. Liles*, No. 5:19-CV-00083-MR, 2021 WL 3493150, at *3 n.4 (W.D.N.C. Aug. 9, 2021) (citations omitted).

[4] Based on the context, the court believes CBT is a reference to cognitive behavioral therapy, but the term is not defined anywhere in the report.

different jurisdictions.  (*Id.*)

The dashcam video defendants have provided is from Tharp's vehicle, which was not directly pursuing Conley during the time of the video.  But the video caught the final moments of the chase, and Tharp's vehicle also blocked Conley's vehicle after the pitting maneuver, but another vehicle caused Conley's car to come to a stop.  (*See* Dashcam Video, Ex. A to Dkt. No. 39 (docketed separately at Dkt. No. 41).)  Nonetheless, Conley does not dispute, for the most part, the characterization by defendants of what occurred before that pitting maneuver.[5]  In particular—and in addition to submitting the CAD report himself—he specifically admits that he engaged in a high-speed chase in which he was pursued by law enforcement through multiple jurisdictions.  (Opp'n #1 to Mot. Dismiss 4, Dkt. No. 50.)  He does not dispute, either, that he drove into oncoming traffic (which also is reflected on the dashcam video), was driving recklessly, and was stopped only when hit by a law enforcement vehicle in the pitting maneuver.

The parties' description of events diverge to some degree after the car was stopped, and the court also has available to it the dashcam and bodycam videos submitted by defendants.  As explained by the Supreme Court, a video depiction of an event occasionally might so completely contradict a party's version of events that it could overcome his sworn assertions.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).[6]  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380.  Applying that principle, the Fourth Circuit noted in *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), that where "the record contains an unchallenged videotape

---

[5] Conley quibbles with certain details, but none are material.  For example, he claims that there was only "one intersection temporarily shut down," not a whole road.  He also claims that he has not been found guilty of hitting a law enforcement vehicle, although he does not directly deny doing so.

[6] Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.

capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." The court applies these principles in determining which of Conley's allegations are to be credited and which facts are to be treated as disputed or undisputed.

After his car came to a stop, Conley contends that he essentially surrendered, sticking his hands up, with palms open, through the driver's side window. Three deputies nonetheless "pulled him from the car out on [his] face." (Am. Compl. 5.) He said they were then all on top of him with "knees on his head and back." (*Id.*) He "was put in handcuffs [and] at that point one of the deputies broke [his] left middle finger in half." (*Id.*) He alleges that, in addition to his broken finger—which ultimately required surgery and was later amputated after it became infected—he suffered some type of pain in his right hip. Although not included in his complaint, his unsworn opposition to defendants' motion also states that he received a knot on his head above his right eye. (Opp'n #1 to Mot. Dismiss 4–5.)

In his opposition, he clarifies that it was defendants Berry and Grigsby who pulled him to the ground where his head "hit the ground," and they were joined "later" by Tharp. (Opp'n #1 to Mot. Dismiss 4–5, Dkt. No. 50.)[7] He says that Tharp "got on [him]" "close to the end." He says he "asked [them] to watch [his] finger," but they were "still . . . messing with [his] finger [and kept] on breaking" it. As a result, he "started cussing them because they wouldn't stop." (Opp'n #1 to Mot. Dismiss 5.)

According to defendants' description of the incident, they were "careful" in pulling Conley out of the vehicle, moving his hands out of the window before opening the car door,

---

[7] The court does not have affidavits from any of the officers involved in the arrest, and it is not entirely clear to the court which officer is which, based solely on the videos. The court is thus imprecise in describing exactly who did what. Regardless, as discussed, the undisputed evidence shows that none of the three officers violated Conley's Fourth Amendment rights.

removing him, and placing him on the ground.  (Mem. Supp. Mot. Dismiss 8, Dkt. No. 39.)
Upon review of the video, however, the court would not characterize his removal from the car or
his placement on the ground as "careful."  Initially, three deputies approached his vehicle
quickly, and two had their weapons drawn.  There was yelling, sirens were blaring from
numerous vehicles, and it is not even possible to tell what exactly is being said or by whom
while Conley was being removed from the car.  The deputies are forcefully—not gently—
removing him from the car, and the video shows that the officers may be giving orders, but the
noise of the sirens does not allow the viewer to hear what is being said.  Nonetheless, it appears
that they are struggling to get Conley out of the car and on the ground.  Once on the ground, it
further appears that Conley is not cooperating with orders to put his hands behind his back so he
can be handcuffed.  One deputy is able to hold Conley's right hand behind his back, and
eventually, they are able to get his left hand behind his back so that he can be handcuffed.

Defendants claim that Conley's face did not hit the ground and the officers restrained his
extremities.  Defendants admit that one officer put his knee on Conley's back, but only long
enough to handcuff him.

The videos do not show Conley's head hitting the ground at any point.  But based on the
angles of the camera and the fact that Conley is not in full view for a portion of the events, it is
not possible to say that his head *never* hit the ground.  Thus, for purposes of summary judgment,
the court must credit Conley's allegation that his head hit the ground at some point while he was
being removed or restrained, knocking off his glasses, and that he had a "knot" above his right
eye.  (Opp'n #1 to Mot. Dismiss 4–5.)  The court also must credit Conley's allegation that his
arrest resulted in some pain to his right hip.

As for Conley's finger, it is unclear from Conley's description of events exactly when he
says his finger was broken.  Conley has admitted that he was cussing at the officers and telling

them to watch his fingers, but the video makes clear that he was not cussing at anyone after he was handcuffed, and the officers immediately stopped applying any force at that point.  So, at the time he says they were breaking his finger, his left hand was free and on or above the ground.  Only his right hand was being held at that point, not his left.  Thus, his recall of the event conflicts to some degree with the video.

Notably, the video disproves that any force was applied to his finger *after* he was handcuffed.  Indeed, on the bodycam video, the sound of the handcuffs being applied can be heard clearly.  Immediately afterward, the officers remove their hands from Conley's hands, ask each other if everyone is okay, and stand up.  Thus, if force was applied that broke Conley's finger—as opposed to it being broken during the chase or pitting maneuver—it happened either before or while he was being handcuffed, not after he was restrained.[8]

Overall, the videos reflect the deputies' clear focus on restraining Conley until they could handcuff him.  As soon as he was handcuffed—a total of thirty-three seconds from the time his vehicle was stopped and less than thirty seconds from when deputies first made contact with him—no additional force was used.  Again, though, because there are times during the process of the handcuffing when the cameras are not directly on Conley (or not directly on his hands), it is not possible to say that they did not break his finger pulling him out from the car, trying to get his left hand behind his back, or simultaneously with handcuffing him.  Thus, for purposes of the summary judgment motion, the court will assume that his finger was broken by the deputies at some point after they first made contact with him and before he was handcuffed.

Timestamps from the dashcam video confirm the relatively short duration of the entire

---

[8]  Based on a frame-by-frame review of the bodycam video, Conley's middle finger appears to be bent at a strange angle in several frames *before* his hand is brought to his back to be handcuffed, which would suggest that the finger was broken before he was even handcuffed, although it is not possible to say that with certainty based on the video.

incident—at least after the lengthy chase ends.  They show the times of events as follows:

> 17:20:21 – Conley's car comes to a stop
> 17:20:23 – Conley holds up his hands out the car window
> 17:20:25 – two deputies are at the driver's side door of the car and one has grabbed Conley's left hand/wrist; thereafter, the deputy has to push Conley's hands back into the car so that the door of the car can be opened without his arms being caught or injured
> 17:20:29 – one of the deputies opens the car door and the two deputies begin pulling Conley out; a third comes to assist
> 17:20:33 – deputies put him on the ground face down, and he appears to be struggling; at one point, one of the officers can be heard commanding, "Give me your hand."  He is then handcuffed, and the officers are checking to make sure the others are all right; and
> 17:20:54 – all of the officers have risen from their positions and no one is any longer putting any force on him.

(Dashcam Video, Dkt. No. 41.)  The bodycam video has times listed that show how many seconds of the video has elapsed, but it does not contain visible timestamps.  Nonetheless, it is consistent with the foregoing.  In particular, it shows that, within about thirty seconds of the car stopping, Conley has been handcuffed and the officers are no longer exerting any force on him.

Thus, construing the disputed facts in the light most favorable to Conley, he placed his hands outside the window shortly after the car stopped and, at about the same time, officers were approaching the car, two of them with their guns drawn and the third attempted to remove him from the car.  After ensuring his hands were out of the way of the door, he was then removed from the car and restrained on the pavement, and his head hit the ground as he was placed on it.  Conley was cussing at officers while they were attempting to handcuff him, and there is video evidence both that he is resisting being laid on the ground and that he is resisting being handcuffed.  At least one officer placed his knee on Conley's back until they could get the handcuffs on him.  The time that he was being held on the ground and that an officer had his knee on his back was approximately twenty seconds.  As soon as he was handcuffed, no additional force was applied, and Conley does not complain of any other use of force at any later point.  Minutes after he is handcuffed, Conley is lifted up and walked out of view of the

cameras, although the dashcam is still recording.[9]

At some point during either his removal from the car or the process of handcuffing him, officers applied sufficient pressure to break his middle left finger.  He suffered the broken finger, a "knot" to his head, and pain to this right hip as a result of the officers' actions.  With regard to the severity of his injuries, Conley describes his finger being broken and ultimately requiring surgery.  He does not indicate that he there was any lasting injury or consequences of him hitting his head, just a "knot" above his eye.  Conley has provided some of his medical records, but no party has provided records from the emergency room on the date of his arrest.  Nothing in the record contradicts Conley's description of his injuries, and the court treats those descriptions as accurate.

**B. Conley's Allegations Concerning His Medical Care**

Given the court's resolution of Conley's medical-based claims on the grounds that he failed to exhaust, the court does not address the other arguments asserted by defendants.[10]  The court's ruling also makes it unnecessary to discuss in detail Conley's medical treatment or his

---

[9]  The remainder of the dashcam video—via Camera 2, which shows the back seat of Tharp's vehicle, depicts Conley immediately before he is being put in the vehicle saying, "Sir, watch my finger please." (Dashcam Video at 17:27:52.)  Conley is read his *Miranda* rights, and he answers some questions, explaining that he fled because of his outstanding warrants.  Thereafter, Camera 2 also includes some of the exchange between Conley and a woman from the rescue squad (presumably an EMT), who is inquiring about his injuries.  Conley's responses cannot always be heard or understood, but the EMT asks questions and repeats Conley's apparent answers.  He conveyed to her that he thinks "they broke [his] finger" and that his "right hip is hurting."  He initially denied neck pain and stated that he had feeling in his legs, but then stated that he "might have a little pain in [his] neck." (Dashcam Video 17:31:34–17:32:04.)

[10]  Those arguments include that Conley's claims against most defendants fail on their merits because he fails to state a negligence claim under Virginia law, defendants are entitled to sovereign immunity for any negligence claims, and he has not shown that any defendant was deliberately indifferent so as to state an Eighth Amendment claim.  Defendants note that Conley was treated repeatedly while at the Jail, was sent for outside consults, and was provided two surgeries while incarcerated at Culpeper and thus cannot show deliberate indifference, but at most, only a disagreement over treatment. (*See* Mem. Supp. Mot. Dismiss 8–11.)  Defendants also argue that Conley's medical malpractice claim fails because he did not obtain an expert certification as required under Virginia Code § 8.01-20.1, but that argument ignores the Fourth Circuit's decision in *Pledger v. Lynch*, 5 F. 4th 511, 514 (4th Cir. 2021), which held that a similar certification requirement was "inconsistent with the Federal Rules of Civil Procedure, and thus [is] displaced by those rules in federal court."  Lastly, defendants contend that they are entitled to qualified immunity. (*Id.* at 11–13.)  As noted in the text, though, the court need not rule on any of these arguments, in light of its rulings herein.

complaints about it.  To summarize, Conley's amended complaint reflects that, in his first month at the Jail, he was referred to an outside physician to consult regarding his finger, and then was seen by a hand surgeon, who performed a surgery to correct his finger, which was apparently unsuccessful.  The surgeon wanted to do a second surgery, but Conley wanted a different physician to do the surgery.  Ultimately, after being told he could use this physician or elect not to continue treatment, Conley had the second surgery.

His amended complaint also contains additional allegations about things that occurred during the course of his medical treatment, including temporary denials of pain medication or ice, having to sleep on the floor (on a mat) while being housed in a medical cell.  He also alleges that, after the second surgery, he was denied the medication recommended by his surgeon, and the Jail physician instead prescribed a medication he should not take because it caused him to have low platelets.[11]  He also alleges that, after the second surgery in March, his finger became infected.  Although Nurse Traci started him on antibiotics "around the end of March."  (Opp'n #2 to Mot. Dismiss 1, Dkt. No. 51), they were apparently unsuccessful in resolving the infection.

On April 20, 2021, he was seen by the Jail's nurse and doctor, and he says his finger was still red and swollen and he should have been given antibiotics at that time, but he was not.  One week later, on April 27, he was transferred to Rappahannock Regional Jail (RRJ) to be housed while awaiting a court date.  On May 1, he went to medical at RRJ.  After seeing his finger, the nurse started him on antibiotics immediately.  When he was checked the next day, medical personnel directed that he be taken to the hospital and he was admitted for the infection in his finger.  Ultimately, the hospital physician determined that the finger had to be amputated.

Conley suggests that if he had been properly treated on April 20, while still at the Jail, he

---

[11]  In an apparently unrelated medical claim, Conley asserts that he needed specialty shoes for medical reasons, but he was denied them because he could not afford to pay for them.

would not have lost his finger.  And he disputes defendants' characterization of his condition

worsening to the point of amputation only while at RRJ.  He submits that the magnitude of

infection he had did not "happen overnight."  (Opp'n #2 to Mot. Dismiss 2; *see also* Sur-reply in

Opp'n to Mot. Dismiss 13, Dkt. No. 72 ("[There] is no way that the infection that was in my

finger happened from April 27 to May 2, 2021," the dates when he was at RRJ.).)  Instead, the

fact that the infection led to amputation so quickly shows that he was sent from the Jail "with

[his] finger already in bad shape."  (Opp'n #2 to Mot. Dismiss 2.)

## C.  The Jail's Grievance Procedure and Conley's Attempts to Exhaust

The Jail has a written grievance policy, which defendants have provided.  Any Jail inmate

who wants to submit a grievance must follow the Jail's Grievance Procedure, which contains

several steps.  (Taylor Decl. & Ex. 2, Ex. C to Mot. Dismiss, Dkt. No. 39-3.)  First, an inmate

must fill out and submit a grievance form describing the basis for the grievance and "what action

the inmate is requesting."  (*Id.*)  That grievance goes to the Shift Supervisor on duty unless that

supervisor is named in the grievance.  The supervisor then has nine working days to respond in

writing.

If the inmate is dissatisfied with the response to his grievance, the inmate may appeal in

writing to the Chief Jailer.  The Chief Jailer also shall respond in writing within 9 working days.

If still dissatisfied with the response, he may appeal in writing to the Grievance Committee, who

has 9 days to respond and then, the "final step" is an appeal to the Sheriff.  An inmate has not

exhausted his administrative remedies until he has appealed to the Sheriff.  (*Id.*)

Conley acknowledges in his amended complaint that he failed to exhaust the

administrative process.  (Am. Compl. ¶ D.)  Moreover, defendants have presented evidence that

Conley failed to exhaust any of his claims.  Specifically, Taylor's affidavit and the supporting

documentation reflect that the only request they received from him asking for grievance forms

was dated January 19, 2022, that he was provided those forms, and that he never submitted any grievances, let alone appeal any, regarding the allegations underlying this lawsuit.  (Taylor Decl. ¶¶ 5, 6.)  Thus, Conley did not exhaust his administrative remedies as required by the Jail policy. (*See id.*)

In both his amended complaint and his response to defendants' motion, Conley states that he turned in a lot of request forms requesting grievance forms and those forms "would disappear."  (Opp'n #1 to Mot. Dismiss 2; *see also* Am. Compl. ¶ D (explaining that he did not grieve the issues in his complaint "[b]ecause I ask for grievance forms but they don't give them out . . . ."); *see also* Sur-reply in Opp'n to Mot. Dismiss 1–3 (asserting in general terms that he repeatedly asked "a lot of different times" for grievance forms until he realized that his request forms were "disappearing" so that it "was pointless to keep [trying]").)  In his opposition to the motion to dismiss, after defendants presented evidence that he had received a grievance form in January 2022, he claims that the one grievance form he received on January 19, 2022, was the first time in a "[whole] year that they finally sent one to me."  (Opp'n #1 to Mot. Dismiss 2.)  He claims that he filled out that grievance form and turned it back in, but "they" must have shredded it. [12]  He does not identify when or to whom he submitted it, nor does he provide any proof— only his conclusory statement—that if "they didn't like the subject matter of a grievance," the form would "disappear."  (*Id.*)  He claims he "tried many times after the lysol being sprayed in

---

[12]  This is the only grievance Conley says he actually submitted, and it was in January 2022, more than eight months after his finger had been amputated and after all of the events alleged in his Amended Complaint.  (*See generally* Dkt. No. 66.)  That grievance pertained to a January 19, 2022 incident, in which the day room toilet was broken and deputies initially refused to take Conley to the bathroom.  They later allowed him to use the bathroom, but subsequently pulled him off the toilet while he was using it, making Conley visible to other inmates.  Afterward, Conley was taken to a cell that smelled like urine.  Thus, even crediting his testimony that he handed in a grievance about this incident and it "disappeared," it would not mean that he exhausted the claims in this lawsuit.

Similarly, Conley also has submitted requests and responses to them in 2022, *after* he filed this lawsuit, which primarily relate to his requests to be seen by a neurologist.  (*See generally* Dkt. No. 73.)  If Conley wants to file a separate lawsuit or lawsuits based on the January 2022 incident or any of these other issues, he may do so.  But those allegations and claims are not part of this case, and the fact that he may have exhausted grievances as to any of those incidents does not mean he did so with regard to the claims in his complaint.

[his] face about many issues of the [deputies'] actions and about [his] medical treatment and they never let me fill any out except the one and it never came back." (*Id.* at 3.)

Defendants filed a reply in which they responded to Conley's vague allegations by including an affidavit from Deputy Sheriff Collins. Collins does not directly address Conley's unsupported assertion that he was denied grievance forms. But he avers that, to his knowledge, no deputy ever received a grievance from Conley related to any of the issues referenced in his Amended Complaint and that, to his knowledge, no deputy ever shredded or otherwise improperly disposed of any grievance forms from Conley. (Collins Decl. ¶¶ 5–6, Dkt. No. 65-1.) Collins also avers that he personally never received such a grievance from Conley nor destroyed or otherwise improperly disposed of any grievance from Conley. (*Id.* ¶¶ 7–8.)[13]

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for

---

[13] Conley's supplemental response attempts to undermine the credibility of several of the declarants based on unrelated alleged misconduct. (*See* Supp. Resp. 6–8, Dkt. No. 72.) But at the summary judgment stage, the court does not make credibility determinations.

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

**B.   The Undisputed Evidence Confirms That The Force Used to Arrest Conley Did Not Violate the Fourth Amendment.**

A claim "that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007).  Applying the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

The court considers three factors to guide this balancing, including (1) "the severity of the crime at issue," (2) the extent to which "the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (quoting *Ray*, 781 F.3d at 101); *see also Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (explaining that the operative question in determining whether the force utilized was "excessive," is whether a reasonable officer would have determined that the degree of force used was justified by the threat presented under the circumstances).  Notably, the officer's conduct is not judged with the "20/20 vision of hindsight," because officers are often called on "to make split-second judgments—in circumstances that are tense, uncertain, and

14

rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  Instead, the factors are analyzed using "the information possessed by the officer at the moment that force is employed." *Henry*, 652 F.3d at 531.

Typically, where there is a dispute of material facts, summary judgment must be denied. And here, the officers deny breaking Conley's finger or allowing his head to hit the ground.  As noted in setting forth the relevant facts in this case, *see supra* Section I.A, the court "must only credit the plaintiff's version of the facts to the extent it is not contradicted by the" unchallenged video.  *Iko*, 535 F.3d at 230.  Applying those principles here, and having reviewed the video of the moments preceding his arrest and Conley's arrest, the court has credited the portions of Conley's statements that are not flatly contradicted by the video.  The facts, otherwise construed in the light most favorable to Conley, are as set forth in the factual section.

Overall, there were three uses of force by the officers.  Officers used force in: (1) executing the pitting maneuver, (2) pulling Conley from his vehicle, and (3) applying force to his back briefly and holding him down, until they could get him handcuffed.  Thereafter, there was no additional force used, nor any about which Conley complains.[14]  The court discusses each in turn.

As to the first, it does not appear that Conley is challenging the reasonableness of using a "pitting" maneuver to stop his vehicle.  Regardless, it is well established that, in order to end a high-speed chase, a "pitting" maneuver—despite the risk of harm and death to the suspect—may be utilized to end a chase.  *See Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate

---

[14]  Because Conley does not allege that any of the uses of force occurred *after* he was handcuffed, this case is distinguishable from many others in which an officer assaulted or used force on an already-handcuffed plaintiff. *See, e.g.*, *Jones v. Buchanan*, 325 F.3d 520, 529–30 (4th Cir. 2003) (noting that applying force on a suspect who is already handcuffed behind the back, even if the suspect is being belligerent, is generally unwarranted because there is no threat to law enforcement at that point); *id.* at 533–34 (collecting authority for same).

the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."); *Plumhoff v. Richard*, 572 U.S. 765, 776–77 (2014) (concluding that police acted reasonably in firing 15 shots into a vehicle that had been stopped after a high-speed chase, where the driver appeared intent on resuming his flight); *see also Dalton v. Liles*, No. 5:19-cv-00083, 2021 WL 3493150, at *6 (W.D.N.C. Aug. 9, 2021) (holding that it was objectively reasonable for officers to conclude that a high-speed chase "posed a substantial and immediate risk of serious physical injury to others, and to attempt to terminate the chase by employing the PIT maneuver"). Thus, that aspect of the event did not violate Conley's rights.

Conley complains, however, about the second and third uses of force. He contends that the officers used excessive force in removing him from the vehicle and in handcuffing him, allowing his head to hit the ground and breaking his finger in the process. Conley emphasizes that he was holding his hands raised, with palms out, as the deputies approached him, in a gesture apparently designed to show that he was not resisting. And he appears to be arguing that, because he was telling the officers that he would not "give them any problems," no additional force was required or appropriate.

In determining whether the force used was "objectively unreasonable," the court must look to the three factors cited above. The first factor—"the severity of the crime at issue"—clearly weighs in defendants' favor. Conley had just committed felony eluding and engaged in a lengthy high-speed chase that endangered numerous law enforcement officers and other drivers.

The court concludes that the second and third factors are more nuanced, in part because, at the time deputies approached (only seconds after his car came to a stop), Conley was appearing to give himself up. Conley seems to suggest that simply because he was holding his hands up and outside the window, he did not pose "an immediate threat" (the second factor) and was not "actively resisting arrest or attempting to evade" (the third factor). Thus, he contends

that it was not reasonable for the officers to remove him from the vehicle and handcuff him, although he does not suggest a viable alternative.  Perhaps he believes that they should have calmly asked him to exit the car and lie down on the ground or turn around so they could handcuff him.

To be sure, the use of force must be justified at each point in an encounter with a suspect, and "even where an initial use of deadly force is reasonable, the repeated use of force may be constitutionally excessive if circumstances change in a material way." *Harris v. Pittman*, 927 F.3d 266, 268–69 (4th Cir. 2019); *see also Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We . . . hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").  But the Fourth Circuit also has cautioned that courts must avoid making "[a]rtificial divisions in the sequence of events" and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 2003); *see also Plumhoff*, 572 U.S. at 774 (citing *Graham*, 490 U.S. at 396) (instructing that the inquiry as to whether a particular seizure was reasonable "requires analyzing the totality of the circumstances"); *Waterman*, 393 F.3d at 481 (harmonizing the two seemingly conflicting principles by noting that *Rowland* does not mean that the reasonableness of force cannot change during an encounter, but simply that the events must be viewed in the "context of the conduct that precipitated the seizure").

Here, Conley was not an individual who had been pulled over for a minor traffic violation and was being cooperative.  Instead, the full context was that Conley had just engaged in a high-speed chase that lasted at least twenty minutes and endangered both the general public and numerous law enforcement officials.  That chase had had ended just seconds before he raised his hands and seconds before deputies arrived at the door of his car to arrest him.  Moreover, it had

ended not because Conley elected to slow down, stop, or give himself up, but only because law enforcement purposefully struck Conley's car in the pitting maneuver.

Given that full context, the officers at the scene were not required to trust Conley's words that he would be compliant in the immediate aftermath of that chase or to regard him as a non-dangerous, non-resisting suspect, despite his palms being up. He had not been compliant for at least twenty minutes, but instead had shown an utter disregard for the lives of others, including the officers. He also was not being arrested for a traffic violation or some minor or misdemeanor offense, but he was wanted on felony warrants and had just engaged in felony eluding.[15] Given those facts, it was reasonable for offers to believe that Conley—who remained unrestrained and was still behind the wheel of the vehicle he had just used to elude officers—still posed a "threat to the safety of the officers or others," despite his hands being up. The second factor thus favors defendants.

Similarly, the third factor—whether Conley was "actively resisting arrest or attempting to evade arrest by flight"—at least slightly favors defendants. As noted, Conley had been attempting to evade arrest by flight for at least twenty minutes. At the very moment the officers approached the car, his hands may have been up, but even in getting him out of the car and getting him handcuffed, Conley was not being cooperative, but was struggling. The video clearly reflects the officers having difficulty in getting Conley to place both hands behind his back so he could be handcuffed. As noted, an officer can be heard yelling at him, "Give me your hand!" because Conley is not being cooperative in the handcuffing process, whether that is

---

[15] There was also at least one time when dispatch reported Conley was seen "digging" around in the car, so it is even possible that deputies thought he might have had a weapon in the vehicle, or at least were not sure whether he had one. But because the record does not contain affidavits from any of the defendants involved in this incident, the court does not know whether that was a consideration or concern of any of the arresting officers. The court does not rely on the possibility that he may have been armed in determining whether the force used was unreasonable.

18

because of his finger hurting or for some other reason.  And even he admits that he was cussing at the officers while they were trying to handcuff him.

In comparable circumstances, courts have held that officers used reasonable force in removing a suspect from a car and handcuffing him.  *See Dalton*, 2021 WL 3493150, at *7 (concluding, under similar circumstances, that although a high-speed chase had been ended with a PIT maneuver and the suspect's van was stopped, actions by officers were reasonable and did not violate the Fourth Amendment, including drawing weapons to approach the van, holding the suspect down so he could be handcuffed, and striking him with a closed fist where plaintiff was resisting putting his hands behind his back so he could be handcuffed); *id.* (collecting supporting authority).  Similarly, the deputies were justified in using the force they did on Conley, until he was restrained.

*Pegg v. Herrnberger*, 845 F.3d 112 (4th Cir. 2017), is instructive on this point.  There, an officer had pulled the plaintiff over for a minor traffic infraction.  The plaintiff followed some instructions, including exiting his vehicle, turning around and putting his hands behind his back, but he questioned the officer about what was happening and failed to lock his hands as instructed.  845 F.3d at 116.  In response, the officer pushed the plaintiff up against his truck and, when the plaintiff resisted the officer's attempts to pull his right arm back, the officer took him to the ground, and both troopers pinned him there and "handcuffed him in an event that took less than forty seconds before the plaintiff was helped to his feet." *Id.*  The incident resulted in minor scrapes and abrasions on the plaintiff's head. *Id.*  The court held that the officers were entitled to qualified immunity on any excessive force claim under the Fourth Amendment. *Id.* at 120. *Accord Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 907 n.11 (4th Cir. 2016) ("Applying just enough weight to immobilize an individual continu[ing] to struggle during handcuffing is not excessive force.")

The same is true here, and the force used was minimal.  None of the officers used a weapon, and none of them kicked or punched Conley, or otherwise engaged in actions clearly designed to harm him.  Instead, the clear focus was getting him handcuffed.  As soon as that was accomplished—which took about 30 seconds from the time the car stopped—all force stopped.  Because the court concludes that no reasonable jury could find the officers' conduct was objectively unreasonable, defendants Tharp, Grigsby, and Berry are entitled to summary judgment in their favor as to Claim 1.

**C.  Claim 2 (and Any Other Claims Arising From Conley's Incarceration) Are Barred Because Conley Failed to Exhaust His Administrative Remedies.**

As noted, defendants ask for summary judgment on the grounds that Conley failed to exhaust his administrative remedies.  The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation that does occur by leading to the preparation of a useful record."  *Jones v. Bock*, 549 U.S. 199, 219 (2007).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."  *Id.* at 211.

Notably, the PLRA requires "proper exhaustion" of available remedies prior to filing suit.  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  "[P]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceeding."  *Id.* at 90–91.  Thus, an inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative

review is not "proper exhaustion" and will bar the claim. *Id.* at 90. Furthermore, district courts may not "excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. *Jones*, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the inmate. *See, e.g., Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011).

Here, the undisputed facts establish that Conley did not exhaust his claims related to his incarceration at the Jail. He argues that the grievance process was unavailable because he repeatedly submitted request forms asking for grievance forms but unspecified deputies would make those requests "disappear." Critically, though, his assertion is unsupported by any detail. Notably, he does not say to whom he gave any such written requests, when he did so, or who threw away his informal complaints or grievances. He offers no additional detail.

Numerous courts within the Fourth Circuit and elsewhere have held that "unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment." *Pickens v. Lewis*, No. 1:15-CV-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017). As one court has explained, to allow such general statements to defeat summary judgment "would permit an inmate, this one and all others, to circumvent the exhaustion requirement merely by making unsupported allegations of purported acts of neglect and obstruction by prison officials of the administrative process." *Allen v. Cartridge*, No. 8:08-600-HFF-BHH, 2010 WL 1257333, at *2 (D.S.C. Mar. 29, 2010). Thus, Conley has failed to meet

21

his burden to show remedies were unavailable, and his claims must be dismissed based on his failure to exhaust.

**D.  The Court Will Decline To Exercise Jurisdiction Over Conley's State-Law Claims.**

In describing his claims concerning his medical care, Conley repeatedly refers to the negligence of medical providers.  Defendants appear to interpret his complaint as asserting claims of negligence and medical malpractice.  To the extent that his complaint asserts any state-law claims, and in light of the dismissal of all of his federal claims, the court declines to exercise jurisdiction over any state-law claims.  *See* 28 U.S.C. § 1367(c)(3).

### III.  CONCLUSION

For the reasons stated above, the court will grant defendants' motion for summary judgment as to all of Conley's federal claims and will decline to exercise jurisdiction over his state-law claims.  An appropriate order will be entered.

Entered: February 9, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge